# EXHIBIT 1

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

JOSEPH HAMILTON,

                                  Case No: -CD

    Plaintiff,                         Hon.

vs.

FORD MOTOR COMPANY,

    Defendants.

_____/

MUNGO & MUNGO AT LAW, PLLC
Leonard Mungo (P43562)
Attorney for Plaintiff
31700 Telegraph Rd.Ste.250
Bingham Farms, MI 48025
(248) 792-7557
caseaction@mungoatlaw.com

_____/

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

**THERE IS A PENDING CIVIL ACTION BETWEEN
THE PARTIES ARISING OUT OF THE
TRANSACTION OR OCCURRENCE
ALLEGED IN THIS COMPLAINT BEFORE
JUDGE ELIZABETH A. STAFFORD IN THE UNITED
STATES DISTRICT COURT OF MICHIGAN EASTERN DISTRICT
CASE NO. 2-25-cv-13418**

**NOW COMES,** Plaintiff, **Joseph Hamilton**, by and through his attorneys, **Mungo & Mungo at Law, PLLC,** and states in support of his Complaint, the following:

## NATURE OF THE ACTION

1.    This is an unlawful employment discrimination case based on gender, race, color, weight and age pursuant to the Michigan Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101,

1

*et seq.* and disability pursuant to the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1202.

## JURISDICTION, PARTIES AND VENUE

2. Plaintiff, Joseph Hamiton is a fifty-one (51) year old African American male, with a prosthetic eye who also suffers from vertical vein disorder in both of his legs and who at all times material hereto was employed by Defendant Ford Motor Company, **("FMC")**, in Wayne County, Michigan.

3. Defendant, **FMC** at all times material hereto conducted business in the City of Dearborn in the state of Michigan including Wayne County, Michigan and was at all times material hereto Plaintiff's employer pursuant to ELCRA, MCL 37.2201 (a) and the PWDCRA, 37.1201.

4. Plaintiff at all times material hereto was an employee of Defendants **FMC**, pursuant to and within the scope and meaning of ELCRA, MCL 37.2201(a) and the PWDCRA 37.1201.

5. The amount in controversy exceeds $25,000, exclusive of interest, costs, and attorney fees.

## COMMON ALLEGATIONS

6. Plaintiff incorporates by reference paragraphs 1-5.

7. At all times material herein, Mr. Hamilton was employed with Defendant **FMC** as a Materials and Planning Logistics agent for Defendant Ford Motor Company.

8. Mr. Hamiton began his employment for Defendant FMC on or about February 15, 2015, and was employed with Defendant **FMC** for over four (4) years as a Materials and Planning Logistics Agent before he was wrongfully and discriminatorily terminated on or around October of 2021.

9.    In his position as a Materials and Planning Logistics Agent Mr. Hamilton was responsible for operating the Hilo, forklift, tow truck, burden carrier for Defendant FMC.

10.    Mr. Hamilton, in his over four (4) years of employment working for Defendant, FMC, has always performed his job responsibilities satisfactory and above. Mr. Hamilton has also never been disciplined for his conduct nor had he been addressed for his performance or lack thereof during the entire course of his employment with Defendant FMC.

11.    On or about August of 2017, Plaintiff was in a car accident which led to Plaintiff sustaining life-altering injuries to his back/spine, leg, and eye, this prevented Mr. Hamilton from returning to work on a temporary basis. Mr. Hamilton, in accordance with Defendants' policy, was placed on medical leave after providing the appropriate information to FMC and the International Union, United Automobile, Aerospace and Agricultural Implement Woekers of America ("UAW").

12.    In around December of 2017, Hamilton was cleared by the Rouge Medical Department to return to work after recovering from his injuries sustained in the above-referenced accident.

13.    On or about January 2, 2018, Mr. Hamilton returned to work after being cleared, however Defendant FMC's Labor Relations Department denied Mr. Hamilton's return to work with the alleged reason being that Mr. Hamilton still had personal work restrictions.

14.    On or about January 11, 2018, Mr. Hamilton was allowed to return to work with no restrictions after having his personal restrictions lifted, where Mr. Hamilton was able to work for two weeks, before being informed by his supervising process coach employed by Defendant FMC that Mr. Hamilton needed to sit for his annual medical exam.

15.     After attending said medical exam, it was determined by Defendant FMC's medical department that Mr. Hamilton could no longer drive the Hilo because of the injury Mr. Hamilton sustained to his left eye as a result of the August 2017 automobile accident that he was involved in. Defendants told Mr. Hamilton to have that duty restored, that he needed to provide the appropriate medical documentation to clear him.

16.     On or about January 31, 2018, in the interim, when Mr. Hamilton came to work, Defendants assigned him the duty of cleaning the Hilo charges, a substantial decline in the prestige of the type of work Mr. Hamilton was previously performing for Defendants.

17.     The medical documentation requested by Defendants was the same medical documentation that Mr. Hamilton had already provided Defendant with when Mr. Hamilton originally returned to work on January 2, 2018. Plaintiff's similarly situated coworkers not suffering from a disability nor were individuals who were members not of his protected class subjected to this type of treatment by Defendants.

18.     Upon being cleared to operate the Hilo again, Defendants placed Mr. Hamilton in a high-traffic area where due to his eye injury it would be difficult for Mr. Hamilton to operate the Hilo.

19.     Defendants have, and in the past, placed Mr. Hamilton and his similarly situated co-workers in low-traffic areas when operating the Hilo. Defendants also could have assigned Mr. Hamilton to a burden carrier or had him operate the train tags but instead put him a position where he could fail or be injured.

20.     When Mr. Hamilton requested from his coach to be placed in a lower traffic area while operating the HILO, his coach responded in the presence of his coworkers by saying, "Why don't you just quit the job?"

4

21.     On or about February 13, 2018, Mr. Hamilton was told that he needed to be subjected to yet another medical examination by Defendant's medical department.

22.     Eventually it was concluded that Ford's medical department failed to properly maintain Mr. Hamilton's medical records that he provided them with in January and that he did not in fact need to sit for another medical examination. Mr. Hamilton went on to successfully perform his job duties until on or about October of 2019, when his leg injury from the 2017 motor vehicle accident that he was involved in became exacerbated due to negligent medical care.

23.     Mr. Hamilton, again, complied with Defendants' policy, and was placed on medical leave after providing the appropriate information to FMC and the UAW.

24.     In or about October 20, 2019, it was determined by Mr. Hamilton's doctor that Mr. Hamilton had been suffering from vertical vein disorder which required immediate attention and operations on Mr. Hamilton's legs. Mr. Hamilton underwent operations on both of his legs within a matter of two (2) days of his doctor determining that he had been suffering from said diagnosis, and in total underwent six (6) operations on both of his legs.

25.     During this period of time and throughout Mr. Hamilton's recovery from the surgeries on his legs, Mr. Hamilton remained employed with Defendant FMC as he had been in compliance with Defendant's regulations necessary to go on medical leave. Defendant FMC had knowledge of Plaintiff's injuries and the procedures he underwent as a result of same.

26.     In or about January of 2020, Mr. Hamilton, still on medical leave, went for a follow-up visit to Oakwood Dearborn hospital because the operation-site on his legs were irritating him. It was determined by his physician that the operation sites had become infected, Mr. Hamilton was placed in infectious disease quarantine at Oakwood for six (6) days. Defendant FMC had knowledge of Plaintiff's injuries and the procedures he underwent as a result of same.

27.     To treat this infection, Mr. Hamilton was prescribed temporary antibiotics and water pills by his medical physician, which Mr. Hamilton continues to take to this day.

28.     Mr. Hamilton maintained his employment status with Defendant FMC as he had been in compliance with the regulations necessary to remain on medical leave. In or around October of 2020, Mr. Hamilton received communication from Defendant FMC, letting him know that he had exhausted all of his fifty-two (52) week medical leave and that to continue employment with Defendant and receive income that Mr. Hamilton needed to apply for social security disability.

29.     Mr. Hamilton, promptly, complied with Defendant FMC's request and was approved for Social Security Disability benefits immediately by both his doctor and the Defendant FMC's medical department because of the serious nature and state of his leg injuries.

30.     Due to the nature and state of Mr. Hamilton's disability and or injuries, he remained on Social Security disability status throughout the majority of 2021.

31.     On or about August 24, 2021, Mr. Hamilton received a letter from Defendant FMC, stating in part that "… the statement from your doctor either has not been received or does not contain sufficient information to justify your continued absence." The statement also told Mr. Hamilton that he had five (5) days to report to the Human Resources Department or provide Defendants with a satisfactory reason for his absence or Mr. Hamilton would be terminated.

32.     Throughout Mr. Hamilton's time out from work due to his injuries/disabilities, Defendants had never raised such an issue and Unicare (who Defendants no longer associate or do business with) and the UAW had been responsible for and had been providing Defendants with updated medical documentation required for Mr. Hamilton to remain on medical leave and social security disability status.

33.     Mr. Hamilton's Union representative acknowledged during Mr. Hamilton's Grievance process that Unicare had in fact dropped the ball if there had been any lapse in Defendants receiving the appropriate medical documentation needed from Mr. Hamilton during his time on medical leave and or social security disability and that it was not Mr. Hamilton's fault.

34.     Further, upon receiving said letter from Defendants, Mr. Hamilton immediately made multiple attempts to reach his union representative via phone call and text message to address the letter/issue as same caught Mr. Hamilton off guard. Mr. Hamilton's Union representative never responded to Mr. Hamilton's calls or text messages in a timely manner.

35.     In or about September of 2021 out of desperation and fear of losing his job, Mr. Hamilton, although not feeling physically fully ready to return (still suffering from vertical vein disorder) to work with a reasonable accommodation, informed Defendants that he was going to try and return to work. Defendants informed Mr. Hamilton that he could make said return upon passing a fit for duty exam, which Mr. Hamilton passed.

36.     None of Defendant management, Mr. Hamilton's supervisors, coaches or team leaders checked in on or reached out to Mr. Hamilton to check on the status of his health while he was out on leave.

37.     However, before Mr. Hamilton could work, he was informed by Human Resources Director that he needed to be subjected to a waiver hearing before Mr. Hamilton could return to work. As a result of the waiver hearing, Mr. Hamilton was terminated with the alleged reason provided by Defendant for said termination being that he did not submit medical documentation in a timely manner.

7

38.     Defendants have treated Mr. Hamilton's similarly situated coworkers not of the same protected classes and not suffering from a disability more favorably under the same and or similar circumstances.

39.     The above-described termination of Mr. Hamilton resulted in him filing a grievance against Defendant FMC which eventually resolved on or about August 26, 2024, in which Defendants offered Mr. Hamilton reinstatement under terms that were conditional which led to Mr. Hamilton's rejection of this offer of reinstatement. *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 132, 517 N.W.2d 19, 31 (1994).

40.     The terms of the partial reinstatement offered by Defendants would classify Mr. Hamilton's employment status in a way that would deprive him of the opportunity of returning to a substantially similar or equivalent position and benefits and otherwise adversely affect the status of his employment.

41.     Said adverse effect upon the status of his unreasonable and conditional partial offer of reinstatement also constitutes a violation of Michigan's People With Disabilities Civil Rights Act as Defendant's took action adverse to Mr. Hamilton with respect to the terms, conditions, and privileges of his employment.

42.     Defendants have treated Mr. Hamilton's similarly situated coworkers not of the same protected classes and not suffering from a disability more favorably than Mr. Hamilton under the same and similar circumstances.

## COUNT I
## INTENTIONAL DISCRIMINATION BASED
## ON GENDER, RACE, WEIGHT, COLOR AND AND AGE IN VIOLATION OF
## THE ELLIOT-LARSEN CIVIL RIGHTS ACT

43.     Plaintiffs incorporate by reference paragraphs 1- 42.

8

44. At all times material hereto, Plaintiff was an employee of Defendant. Defendant was Plaintiff's employers within the meaning of ELCRA, MCL 37.2201 (a) in relationship to Plaintiff.

45. Plaintiff, Joeseph Hamilton's race and/or gender, and/or color and/or age and/or weight was at least one factor that made the difference in Defendant's unlawful discriminatory practices that Defendant subjected Plaintiff to in its offer of reinstatement and treatment of Mr. Hamilton after missing work due to a disability.

46. Had Plaintiff been Caucasian, lighter skinned, younger, female and or weighed less he would have been not have been discriminated against in the terms, conditions, and privileges of his employment.

47. Defendants, through their agents, representatives and employees, were predisposed to discriminate on the basis of race, color, weight, gender and or age and acted in accordance with that predisposition.

48. Defendants through its agents, representatives and employees treated Plaintiff differently, less favorably, than his similarly situated white, lighter skinned, lighter weighted, female and or younger employees in the terms, conditions and privileges of employment, based on race, color, weight, gender and/or age.

49. Defendant's actions were an intentional disregard for Plaintiff's rights and sensibilities.

50. Defendant violated the aforementioned statute by the following acts:

   a. Discriminating against Plaintiff with respect to his employment, compensation, or a term, condition or privilege of employment, because of his race, weight, color and gender including, but not limited to, refusing to accommodate Plaintiff because of his race, African American; color; weight; and gender.

9

b. Limiting, segregating, or classifying Plaintiff in a way which deprived or tended to deprive Plaintiff of an employment opportunity or otherwise adversely affecting the status of Plaintiff because of his race;

c. Segregating, classifying, or otherwise discriminating against Plaintiff on the basis of his race with respect to a term, condition or privilege of employment, including a benefit plan or system; and/or

d. Failing to provide a work environment free from race, weight, color and gender discrimination.

51.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained injuries and damages including but not limited to loss of earnings and earnings capacity; loss of career opportunities; damage to his professional reputation; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including but not limited to the right to pursue gainful employment of choice.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendants as follows:

A. Compensatory damages in whatever amount above $25,000 they are found to be entitled to.

B. Exemplary damages in whatever amount above $25,000 they are found to be entitled to.

C. An award of lost wages and the value of fringe benefits, past and future.

D. An award of interest, costs, and reasonable attorney fees.

E. Damages for emotional and mental distress, humiliation, embarrassment, and injury to professional reputation.

F. An order awarding whatever other relief this Court finds appropriate at the time of final judgment.

## COUNT II
## VIOLATION OF THE PERSONS WITH DISABILITIES
## CIVIL RIGHTS ACT BASED ON DISABILITY

52. Plaintiff incorporates by reference paragraphs 1-51.

53. At all times material, Plaintiff was an employee of Defendants and Defendants were Plaintiff's employer within the meaning of MCL 37.1201 et *et seq*. At all times material hereto, Plaintiff was an employee of Defendants.

54. Plaintiff has disabilities as defined in MCL 37.1103, and Defendants were fully aware of said disability and or perceived him as having one or more disabilities.

55. Had Mr. Hamilton not suffered from his disabilities, vertical vein disorder and his permanent eye injury, Defendants would not have subjected Mr. Hamilton to unlawful discriminatory treatment in the terms, conditions and privileges of his employment.

56. Defendants, through their agents, representatives and employees, were predisposed to discriminate on the basis of Mr. Hamilton's disabilities and acted in accordance with that predisposition.

57. Defendant through its agents, representatives and employees treated Plaintiff differently and less favorably than his similarly situated employees not suffering from vertical vein disorder and a permanent eye injury, in their conditions and privileges of employment. Said disability did not preclude Plaintiff from performing the essential functions of his job.

58. Defendant's treatment of Plaintiff and its offer of reinstatement constitute discrimination within the terms/conditions/privileges of his compensation/employment, and deprivation of employment opportunities were an intentional disregard for Plaintiffs' rights and sensibilities.

11

59.     As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained injuries and damages including but not limited to loss of earnings and earnings capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including but not limited to the right to pursue gainful employment of choice.

60.     Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

61.     As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained a loss of earnings, benefits, suffered mental anguish, physical and emotional distress, humiliation, embarrassment, and a loss of professional reputation.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant as follows:

a.     Compensatory damages in whatever amount above $25,000 that they are found to be entitled to.

b.     Exemplary damages in whatever amount above $25,000 they found to be entitled to.

c.     An award of lost wages and the value of fringe benefits, past and future.

d.     An award of interest, costs, and reasonable attorney fees.

e.     Damages for emotional and mental distress, humiliation, embarrassment, and injury to professional reputation. An order awarding whatever other relief this Court finds appropriate at the time final judgment

Respectfully submitted,

Mungo & Mungo at Law, PLLC

by:/s/ Leonard Mungo
LEONARD MUNGO (P-43562)

December 5, 2025

12

Mungo & Mungo At Law, PLLC
Attorney for Plaintiff
31700 Telegraph Rd. STE. 250
Bingham Farms, Michigan 48025
(248) 792-7557 (phone)
(248) 792-7303 (fax)
caseaction@mungoatlaw.com

13